IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 23-88-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER |
| PHILIP ANTHONY WALLACE, | |
| Defendant. | |

Before the Court is Defendant Philip Anthony Wallace's Motion to Suppress. (Doc. 22). Wallace asks the Court to suppress the statements he made to officers with the Montana Probation and Parole Bureau ("Probation Office") at his residence on June 8, 2022, and the firearms and ammunition seized by the officers at his residence on the same day. (*Id.* at 2). Wallace argues that his statements should be suppressed as involuntarily elicited in violation of the Fifth Amendment, or, in the alternative, as the result of an un-Mirandized custodial interrogation also in violation of the Fifth Amendment. (Doc. 23 at 2). As to the seizure of the firearms and ammunition, Wallace argues that the search of his residence that resulted in the seizure of the firearms violated the Fourth Amendment. (*Id.*).

Wallace requested a hearing. (Doc. 22 at 2). The Court held an evidentiary hearing on April 19, 2024. (Doc. 30). Probation Officer Jennifer Tobin and Sergeant

Arturo Gonzales testified. The Court finds the material facts are not disputed based on the parties' briefing, the officers' reports, and the officers' testimony.

For the following reasons, the Court grants Wallace's motion as to his statement about the presence of firearms in the residence and denies his motion as to his statement about being caught and as to the seized evidence.

## I.    Factual Background

On December 29, 2020, Wallace was found guilty in Missoula County District Court of felony driving under the influence of drugs or alcohol in violation of Montana Code Annotated § 61-8-401(1)(a), misdemeanor careless driving in violation of Montana Code Annotated § 61-8-302(1), and misdemeanor failure to give notice of accident involving property damage in violation of Montana Code Annotated § 61-7-107. (Doc. 24 at 26–28). He was sentenced to five years in prison. (*Id.* at 28).

On February 7, 2022, he was placed on conditional release. (*Id.* at 16). As part of his conditions of release, Wallace must reside at a place approved by the Probation Office. (*Id.* at 21). Additionally, "[u]pon reasonable suspicion that the [probationer] has violated the conditions of supervision, [Wallace's] person, vehicle, and/or residence may be searched at any time … without a warrant by a Probation/Parole Officer[.]" (*Id.*); *see also* (*id.* at 30); Mont. Admin. Rule 20.7.1101(7). A search of Wallace's residence "includes the common areas of the

2

residence that are shared by [him] and other occupants of the residence." (Doc. 24 at 19). Wallace is required "at all times [to] be cooperative and truthful in all [his] communications and dealing with Probation/Parole Officers and any law enforcement agency." (*Id.* at 19, 32). Last, Wallace is not allowed to be in control of any firearms, ammunition, or weapons. (*Id.* at 16, 21, 30). Failure to abide by the conditions of his supervision "may result in revocation" and/or immediate jail sanctions. (*Id.* at 24).

Beginning in March 2022, Wallace was living in an RV on a property in Livingston. (Doc. 26-4 at 2). On June 2, 2022, Wallace reported to the Probation Office and told Tobin that he found housing with a friend in Livingston. (*Id.* at 1). Wallace told Tobin there were no firearms, illegal drugs, or alcohol at the residence. (*Id.*). Tobin testified that she gave Wallace permission to reside there, but that she still needed to conduct a home visit to give him written approval pursuant to his conditions of supervision.

On June 8, 2022, at about 11 a.m., Tobin and Gonzalez conducted a home visit at Wallace's new residence. (*Id.*). They walked onto the enclosed porch and noted the smell of smoked marijuana. (*Id.*). Tobin testified that she knocked on the door, waited for a couple minutes, but received no answer. She knocked on the door again and announced they were from the Probation Office. Both officers testified that they could hear someone moving around in the residence. Tobin then walked

3

around to the back of the residence and knocked there.   Meanwhile, Gonzalez knocked on the siding.   Gonzalez testified that a man opened the door, came out quickly, and said to Gonzalez, "Ok you caught me." (*Id.*).   Gonzalez asked him his name, to which the man said "Philip Wallace." (*Id.*).   Gonzalez handcuffed Wallace. (*Id.*).

Tobin testified that she returned to the front of the residence and asked Wallace what took him so long to answer. (*Id.*).   Wallace answered that he knew there were firearms in the residence. (*Id.*).   At the hearing, Tobin testified that Wallace also mentioned the firearms belonged to his roommate.   Gonzalez testified he did not recall whether he heard this conversation, though his chronological notes state that Wallace "spoke to Officer Tobin concerning firearms in the home." (*Id.*).

Just based on Tobin's chronological notes, it seems that Gonzalez entered Wallace's residence to clear it "for safety" before the conversation about the firearms happened. (*Id.*).   However, Tobin clarified at the hearing that Gonzalez entered the residence to conduct the safety sweep after Wallace said there were firearms in the residence and that her chronological notes were just a summary.   Gonzalez's chronological notes also indicate that the conversation happened before he decided to do the safety sweep. (*Id.*).   During the hearing, Gonzalez recalled the conversation happening before he entered the home after reviewing his report.

4

Gonzalez testified that when he entered the residence to do the safety sweep, the kitchen was in front of him, the living room was to his right, and bedrooms were to both his left and right. Gonzalez went right first, then worked his way around the residence, following the walls. Gonzalez testified that when he reached the bedroom on the left, the door was open and he could see a pistol in a holster near the pillow on the bed. Gonzalez specified that he could see the firearm just by looking into the room and without opening anything. Gonzalez stated that he ignored the firearm in the moment and continued his search, since his focus in the moment was to look for individuals. Both officers testified that, at this point, neither knew nor had asked Wallace which room(s) he had access to.

Tobin testified that Gonzalez notified Tobin that he had cleared the residence and noticed a firearm. Tobin then instructed Wallace to go inside and sit in the living room. The officers searched the residence, and Gonzalez located three other firearms in an unlocked gun display case with glass doors. (Doc. 24 at 5). He also found a compound bow and hundreds of rounds of various ammunition, as well as, according to his testimony, a case for a Taurus pistol but not the pistol itself. (*Id.* at 5–10). According to Gonzalez's testimony, Wallace later told officers that his bedroom was on the right where no firearms were found. Wallace was arrested and transported to the Gallatin County Detention Center. (*Id.* at 5).

5

On July 13, 2023, Wallace was charged in this Court with Prohibited Person in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1) and a Forfeiture Allegation under 18 U.S.C. § 924(d). (Doc. 1). He filed the instant suppression motion on February 5, 2024. (Doc. 22).

## II. Discussion

### A. Suppression of the Statements

The Fifth Amendment "protects a person ... against being incriminated by his own compelled testimonial communications." *Fisher v. United States*, 425 U.S. 391, 409 (1976); *see also* U.S. Const. amend. V. ("No person ... shall be compelled in any criminal case to be a witness against himself."). This prohibition not only allows a person "to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). The Fifth Amendment privilege against self-incrimination applies to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 8 (1964).

Wallace argues that the two statements he made to the officers must be suppressed as involuntarily compelled and elicited without a *Miranda* warning in violation of the Fifth Amendment. The Court will address each argument in turn.

6

*1.     Involuntary*

Wallace first argues that his statements were involuntarily compelled because the conditions of his release required him to be truthful and cooperative, thus creating a situation whereby he either could exercise his right to not self-incriminate and have his conditional release revoked for not being cooperative, or to self-incriminate. (Doc. 23 at 6–12).

"As a general rule, the Fifth Amendment speaks of compulsion[.]" *United States v. Saechao*, 418 F.3d 1073, 1077 (9th Cir. 2005) (internal citation and quotation marks omitted). An individual must invoke their privilege to remain silent and not incriminate themselves; otherwise, they will not be considered to have been compelled within the meaning of the Fifth Amendment. *Id.* This rule does not apply if "an individual is subjected to a practice that denies him … a free choice to admit, to deny, or to refuse to answer[.]" *Id.* (internal citation and quotation marks omitted). In that case, the Fifth Amendment is considered self-executing, meaning an individual does not need to invoke the right to have their admissions suppressed in a subsequent criminal prosecution. *Id.* Any statement made is considered involuntary and cannot be used in a criminal proceeding. *Id.*

One instance in which an individual is considered to have been denied the free choice to admit, deny, or refuse to answer is what the Supreme Court refers to as a "penalty situation." *Murphy*, 465 U.S. at 435. *Murphy* specified that in the

7

probationary context, this rule means the state may require the probationer "'to appear and discuss matters affecting his probationary status,'" but that "the probationer may not be required under the threat of revocation of his probation to respond to 'questions put to him, however relevant to his probationary status, that call for answers that would incriminate him in a later criminal proceeding.'" *Saechao*, 418 F.3d at 1077 (quoting *Murphy*, 465 U.S. at 435). Thus, if law enforcement takes the "'impermissible step' of 'requir[ing] [a defendant] to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent,'" any incriminating statements must be suppressed. *Id.* at 1076 (quoting *Murphy*, 465 U.S. at 436).

In *Murphy*, the Supreme Court held that Murphy's admission was not compelled under the threat of penalty because Murphy's probation conditions did not require him to answer the probation officer's inquiry; rather, his conditions only required him to be "truthful with his probation officers in all matters." *Murphy*, 465 U.S. at 436–37. Accordingly, "Murphy could not have been objectively or subjectively 'deterred from claiming the privilege by a reasonably perceived threat of revocation.'" *Saechao*, 418 F.3d at 1078 (quoting *Murphy*, 465 U.S. at 438–39).

The Ninth Circuit in *Saechao* distinguished the facts of *Murphy* on the grounds that Saechao's conditions of probation required him to answer all reasonable inquiries, not just be truthful when he answers. *Id. Saechao* emphasized

the significance of the difference between the conditions: Whereas the condition at issue in *Murphy* says nothing about a probationer's freedom to decline to answer particular questions and prohibits only false statements, the condition in *Saechao* specifically penalizes a refusal to answer particular questions. *Id.* ("In contrast to Murphy, who the Supreme Court found was free to remain silent as long as he was truthful when he spoke, Saechao did not have the luxury of remaining silent without violating the conditions of his probation."). *Saechao* further rejected the government's argument that the state needed to "*explicitly* announce[] that it will impose a penalty for the invocation of [a probationer's] Fifth Amendment rights" for a penalty situation to arise. *Id.* (emphasis in original). Rather, the Ninth Circuit held that the condition requiring the probationer to answer all inquiries "by implication forecloses a probationer's ability to exercise that right by remaining silent." *Id.*

The District of Idaho applied *Murphy* and *Saechao* to incriminating statements made by a Mirandized probationer whose conditions of probation required him to "cooperate with the requests of [their] probation/parole officer. Cooperation includes being truthful." *United States v. Watson*, No. 22-cr-00149, 2023 WL 6794074, at *5 (D. Idaho Oct. 13, 2023). *Watson* held that the condition "falls somewhere between the conditions in *Murphy* and *Saechao*" because it "does not merely require truthfulness" like in *Murphy* but also "does not explicitly require

answers to all inquiries" like in *Saechao*. *Id.* Because the conditions also stated that a probationer's failure to adhere to the conditions—including the cooperation provision—could result in revocation, *Watson* reasoned that the condition operated more like the conditions in *Saechao* by implicitly requiring the probationer "to choose between making the incriminating statements and jeopardizing his conditional liberty by remaining silent." *Watson*, 2023 WL 6794074, at *5 (quoting *Saechao*, 418 F.3d at 1078); *see also United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1029 (D. Or. 2014) (holding that a regulation requiring U.S. Postal Service employees to cooperate with all investigations and providing that failure to cooperate could be grounds for disciplinary or legal action by implication creates an impermissible penalty to exercising the privilege against self-incrimination).

Wallace's case is nearly identical to *Watson*, and though *Watson* is not binding on this Court, the Court finds its analysis persuasive. Contrary to the Government's assertion that Wallace's conditions "only required he be honest in the information he provided" (Doc. 34 at 6), Wallace's conditions required him to be "cooperative and truthful in all [his] communications and dealing with Probation/Parole Officers[,]" (Doc. 24 at 19). Additionally, his conditions specified that failure to abide by the rules and conditions of supervision "may result in revocation" or "immediate jail sanctions." (*Id.* at 24). Though this provision does not explicitly

provide that his conditional release would be revoked if he remained silent, it implicitly suggests as much, as held in *Watson*.

The Court disagrees with the Government that the Court should apply *United States v. Van Pelt*, 569 F. Supp. 3d 1073 (D. Mont. 2021), over *Watson*. (Doc. 27 at 5–6). Unlike *Watson*, *Van Pelt* only discussed the legal significance of the requirement that Van Pelt be truthful, not truthful *and* cooperative, even though Van Pelt was required to be both. *Van Pelt*, 569 F. Supp. 3d. at 1081. As such, *Van Pelt* treated *Murphy*, which only pertained to a truthfulness condition, as on point. *Id.* *Van Pelt* also did not acknowledge the provision allowing the Probation Office to revoke a person's conditional release and/or imprison them if they violate any of the conditions of their release. *Id.* Last, the Court is unsure whether *Van Pelt* is factually analogous, since it is not clear whether Van Pelt said the challenged statement to his supervising officer in response to a question, as is the case here, or he volunteered it. *Id.* at 1078. Rather, *Van Pelt*'s recitation of the facts only stated that Van Pelt's supervisor said in an email to the prosecutor in the case that Van Pelt "told me he asked 'a friend' to give him a gun so he had it when he went 'hiking.'" *Id.* For these reasons, the Court declines to follow *Van Pelt* and instead adopts the reasoning in *Watson*.

Accordingly, when Tobin asked Wallace why he took so long to answer the door, Wallace was faced with a penalty situation whereby he could either answer

11

truthfully and admit that he did not answer immediately because there were firearms in the residence, or remain silent and be threatened with revocation and/or imprisonment. The statement was involuntarily compelled, and therefore suppression of the statement is warranted.

In contrast, Wallace was not compelled to say, "Ok you caught me" when he answered the door and walked outside because the officers' only communication to him up to that point was for him to answer the door. The officers did not ask him any questions or do anything that would imply he needed to say anything, let alone his incriminating remark. *See United States v. Norwick*, CR 23-82-BLG, at 10 (D. Mont. Apr. 29, 2024) (holding that the defendant's statement was not involuntarily compelled because the probation officer did not ask him anything or direct any statement at him). The statement was voluntary, and suppression is not warranted.

      2.      *In Violation of* Miranda

Wallace next argues that his statements must be suppressed because Wallace made them during a custodial interrogation and officers had not read him his *Miranda* rights. Since the Court already determined Wallace's statement about the presence of firearms in the residence is inadmissible as involuntarily compelled, the Court only will assess whether his first statement—"Ok you caught me"—must be suppressed under *Miranda*.

"In *Miranda v. Arizona*, the Supreme Court adopted prophylactic procedural measures to guarantee that a suspect is advised of his Fifth Amendment rights before custodial interrogations." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966)). These measures, known as *Miranda* rights, are constitutional in nature. *See Dickerson v. United States*, 530 U.S. 428, 435 (2000). Thus, failure to advise a suspect of their *Miranda* rights before a custodial interrogation violates the Fifth Amendment and justifies suppression of any statements a defendant made during the interrogation. *Id.*

Whether law enforcement needs to advise a suspect of their *Miranda* rights depends on two questions: Was the defendant (1) in custody, and (2) subject to an interrogation? *Miranda*, 384 U.S. at 444. The parties contest whether Wallace was in custody when he made the first statement but do not address whether he was subject to an interrogation at that time.

       a.    Custody

In cases where a suspect has not formally been taken into police custody, the suspect is considered "in custody" for purposes of *Miranda* if the suspect has been "deprived of his freedom of action in any significant way." *Id.* To determine if such a deprivation occurred, the Court must decide whether, based on the totality of the circumstances, a reasonable person in those circumstances would have believed they could freely walk away from the interrogators. *United States v. Kim*, 292 F.3d 969,

13

973–74 (9th Cir. 2002); *Craighead*, 539 F.3d at 1082.   The Court considers the following factors: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Kim*, 292 F.3d at 974 (internal quotation marks and citations omitted). "Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators[.]" *Id.*

Wallace's arguments about him being in custody cover both statements, so the Court will outline only those relevant to Wallace's first statement. (*See* Doc. 23 at 14–17). First, Wallace asserts the first factor weighs strongly in favor of a finding of custody because Wallace was summoned by the officers who were knocking on the doors and windows of his residence, and Wallace had nowhere else to go. (*Id.* at 14). Second, Wallace argues that the interaction "was inevitably confrontational and leveraged" against Wallace because it took place in the probation officer/probationer context. (*Id.* at 14–15). Third, Wallace asserts the physical setting supports a finding of custody because the officers were at the door of a small residence and were the only people there other than Wallace, making it a "police-dominated atmosphere." (*Id.* at 15). Fourth, Wallace concedes the duration was "perhaps not extensively long," though the reports are not clear. (*Id.* at 16). Fifth,

14

Wallace maintains the degree of pressure applied strong supports a finding of custody because the officers were knocking on the doors and windows. (*Id.* at 17). These factors weigh in favor of a finding of custody, according to Wallace. (*Id.*).

The Government disagrees, arguing that Wallace was not in custody given the totality of the circumstances. (Doc. 26 at 9). As to the first factor, the Government describes the officers as knocking on his front and back door to do a home visit pursuant to Wallace's conditions and Wallace coming out "on his own in an excited state." (*Id.*). As to the second factor, the Government asserts it does not support a finding of custody because Wallace's statement that he was caught "was made unprompted by any questioning." (*Id.* at 10). Third, the Government contends the physical surroundings do not support a finding of custody because only two officers were at Wallace's front door when he made his statement. (*Id.*). Fourth, the encounter was brief. (*Id.* at 12). Last, the Government argues the degree of pressure was minimal because the officers knocked on Wallace's door and waited until he answered instead of, for example breaking into his house or tricking him into answering. (*Id.*). The Government also notes that the officers did not instruct Wallace to come out under the threat of revocation. (*Id.*).

The Court agrees with the Government that Wallace was not in custody when he made the first statement. Wallace voluntarily answered his front door after hearing the officers knocking and made the statement about being caught without

being asked anything. In fact, other than the officers announcing their presence, Wallace's statement was the first thing spoken between Wallace and the officers that day. Wallace was not threatened with revocation or arrest before he made the statement, nor was his residence surrounded by police. Two probation officers, who Wallace should have expected given his new residence was not approved yet, stood on his front porch. *Cf. Craighead*, 539 F.3d at 1085 (finding custody when eight law enforcement officers from three different agencies who were armed and some of whom were in protective gear and had their firearms unholstered entered into the defendant's residence). The situation at the time he made the statement was run-of-the-mill, as far as a home visit goes. *See United States v. Hedrick*, 146 F. App'x 871, 872 (9th Cir. 2005) (describing the legitimacy and commonality of home visits for persons on supervision, particularly in light of supervisee's "conditional liberty" as a result of their status).

Given the totality of the circumstances, the Court finds Wallace was not in custody when he said he was caught. Because Wallace was not in custody, his *Miranda* rights were not violated and suppression of his first statement is not warranted on this ground. Furthermore, as previously discussed, Wallace was not responding to any interrogation when he said he was caught.

B.   *Suppression of Evidence Seized in the Search*

Wallace next argues that Gonzalez's initial entry and sweep into Wallace's residence violated the Fourth Amendment. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. Because "[i]t is axiomatic that 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. U.S. Dist. Ct. for the E. Dist. Of Mich.*, 407 U.S. 297, 313 (1972)), "a 'basic principle of Fourth Amendment law' [is] that searches and seizures inside a home without a warrant are presumptively unreasonable," *Id.* at 749 (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).

"A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions to the warrant requirement[.]" *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999). One of those exceptions is when officers conduct a valid protective sweep. *See Maryland v. Buie*, 494 U.S. 325 (1990). If a search is conducted without a warrant absent an exception to the warrant requirement, then the evidence discovered through the "exploitation of" the illegal search must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

The Government contends the officers' search was a valid probation search based on their reasonable suspicion of a violation of Wallace's conditions of release.

(Doc. 26 at 15–17). The Government relies on the notion that Wallace's residence had not been officially approved as the condition the officers had reasonable suspicion of Wallace violating. (*Id.* at 16). The Government also notes that the officers smelled smoked marijuana on the porch and that Wallace said he was caught when he opened the door. (*Id.* at 17). Last, the Government asserts the officers were justified to conduct a protective sweep because of "the suspicious value of [Wallace's] delay in coming out of the house … his admission of being caught, and his reduced expectation of privacy" as a person on supervision. (*Id.*).

The Court will not consider whether officers were justified in doing a probation search because the officers' reports are clear that the purpose of Gonzalez's first entry into Wallace's house was to conduct a safety sweep. The Government's arguments concerning a probation search are post-hoc rationalizations that are inconsistent with the officers' reports and testimony. *See Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 185 (2004) ("The officer's action must be justified at its inception, and … reasonably related in scope to the circumstances which justified the interference in the first place."). The Court therefore will consider only whether Gonzalez was conducting a valid protective sweep of the residence when Gonzalez saw the gun.

     *1.*       *Validity of the Protective Sweep*

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Buie*, 494 U.S. at 327. A protective sweep is permitted if the officer "possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337. A protective sweep "is not a license to search every nook and cranny of a house, but is subject to two significant limitations: it 'extend[s] only to a cursory inspection of those spaces where a person may be found' and lasts 'no longer than it takes to complete the arrest and depart the premises.'" *United States v. Lemus*, 582 F.3d 958, 962 (9th Cir. 2009) (quoting *Buie*, 494 U.S. at 335–36).

There is a split between the circuits and within the Ninth Circuit as to whether a protective sweep may be done where law enforcement possesses reasonable suspicion that their safety is at risk but has not effectuated an arrest. *See Mendez v. County of Los Angeles*, 815 F.3d 1178, 1191 (9th Cir. 2016), *vacated and remanded on other grounds by* 581 U.S. 420 (2017) (quoting *United State v. Torres–Castro*, 470 F.3d 922, 997 (10th Cir. 2006) (collecting cases, including *United States v. Reid*, 226 F.3d 1020, 1027 (9th Cir. 2000), and *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir. 1993))) ("We note that there is both a split between the circuits and a split within our circuit as to whether a protective sweep may be done 'where officers possess a reasonable suspicion that their safety is at risk, even in the absence of an

19

arrest.'"); *United States v. Franco*, 744 F. App'x 360, 363 n.2 (9th Cir. 2018) (same); Sarah N. Welling, 3A *Federal Practice and Procedure* § 677 (4th ed. 2023) (recognizing circuit split). In *Reid*, the Ninth Circuit held that the protective sweep exception established in *Buie* only extended to sweeps made incident to an arrest. 226 F.3d at 1027 (citing *Buie*, 494 U.S. at 334). However, in *Garcia*, the Ninth Circuit upheld a protective sweep of the defendant's apartment where officers gained lawful consent to enter a home, even though officers had not effectuated an arrest. 997 F.2d at 1282. To the Court's knowledge, neither case has been overruled, nor has the Ninth Circuit clarified whether an arrest is always necessary for officers to conduct a protective sweep.

The Court need not attempt to resolve this intra-circuit split because the officers here had consent to enter Wallace's residence per the conditions of his release and therefore under *Garcia* did not need to effectuate an arrest to conduct a legal protective sweep. Wallace's conditions require him to make his "home open and available for Officers to visit or search upon reasonable suspicion[.]" (Doc. 24 at 21). Further, his residence needed to be approved by the Probation Office. (*Id.*). As Tobin and Gonzalez testified, home visits are a routine part of all supervision and do not require reasonable suspicion, unlike a probation search. Accordingly, Wallace's agreement to allow home visits as a part of his conditional release

provided the officers with the consent necessary for them to enter his home for a protective sweep.

The validity of the protective sweep thus depends on whether Tobin and Gonzalez had reasonable suspicion that a person who was a danger to officers was inside. In determining whether the officers had reasonable suspicion to conduct the protective sweep, the Court must consider the totality of the circumstances. *United States v. Castillo*, 866 F.2d 1071, 1080 (9th Cir. 1988). The Court "must look at all the facts known to the officers and consider all the reasonable inferences that could be drawn by them concerning the need to conduct a protective sweep to protect them from violence." *Id.*

The Government argues the officers had reasonable suspicion to conduct the protective sweep because on "the suspicious value of [Wallace's] delay in coming out of the house ... his admission of being caught, and his reduced expectation of privacy" as a person on supervision. (Doc. 26 at 17). Wallace retorts that no danger existed because Wallace was already detained outside the home and the smell of smoked marijuana was outside the home. (Doc. 27 at 9).

The Court finds that the officers had reasonable suspicion that a person who posed a danger to them was inside. The officers testified they were concerned for their safety because Wallace failed to immediately come to the door and they could hear movement inside the residence, making them wonder if he was hiding and who

21

and/or what was inside. They also testified Wallace's admission that there were firearms inside the residence, combined with the possibility that Wallace's roommate whom they had not met could be inside, further raised their suspicion that their safety may be at risk. Their testimony is consistent with their reports. Given Wallace's suspicious behavior, his report about the presence of a firearm, and the potential that another person was inside, the officers had reasonable suspicion that a person inside was a danger to them and to conduct the protective sweep.

Wallace generally questions the validity of Gonzalez entering the north bedroom because Wallace's conditions of release only authorized the officers to enter and/or search "the common areas of the residence that are shared by you and other occupants of the residence." (Doc. 23 at 23 (citing Doc. 24 at 19)). The north bedroom was Wallace's roommate's, though the officers testified that they did not know that before Gonzalez conducted the protective sweep.

As an initial matter, the condition Wallace cites applies to probation searches, which the protective sweep was not. To the extent Wallace asserts the protective sweep was overly broad because Gonzalez went into a bedroom that was not Wallace's, the Court disagrees. Wallace's conditions do not place limits on the spaces officers are allowed into during a protective sweep. Gonzalez testified that he was concerned that other people, specifically Wallace's roommate, was inside the residence and armed. It is not unreasonable for Gonzalez to believe that Wallace's

roommate might be in one of the bedrooms. Additionally, the north bedroom was unlocked and open, further justifying Gonzalez's entry. *Cf. Franco*, 744 F. App'x at 363 (finding that an officer's search of a closet in a locked bedroom was overly broad). Last, though the exact duration of the protective sweep is not clear, Gonzalez testified that he entered the room, saw the pistol, ignored it, and continued looking for people. This testimony indicates that Gonzalez conducted the protective sweep within the bounds of its purpose, namely to find potentially dangerous persons, not evidence of a crime or violations of Wallace's conditional release. Thus, Gonzalez's entry into the north bedroom while conducting the protective sweep was not overly broad, and the protective sweep was constitutional.

2.      *Plain View Seizure*

Because the protective sweep was justified generally and justified specifically as to the bedroom where the gun was found, the Court next looks at whether the firearm in the bedroom was properly seized. "'[T]he police may seize any evidence that is in plain view during the course of their legitimate emergency activities.'" *United States v. Stafford*, 416 F.3d 1068, 1076 (9th Cir. 2005) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). For the plain-view doctrine to apply, officers cannot have violated the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990).

Second, the item must be in plain view. *Id.* Third, the item's incriminating character must be immediately apparent. *Id.* The parties do not address these elements.

Here, the first requirement is satisfied because Gonzalez was conducting a valid protective sweep of the north bedroom when he saw the gun. The second requirement also is satisfied because Gonzalez testified that he could see the pistol on the nightstand in bedroom just by looking into the room and without opening anything. The third requirement is satisfied because Wallace is not allowed to own, possess, or be in control of firearms pursuant to both the conditions of his release and federal law. (Doc. 24 at 21); 18 U.S.C. § 922(g)(1). The presence of an unsecured firearm in an unlocked bedroom could constitute violations of his conditions and/or federal law. Because the officers had reasonable suspicion of a violation of Wallace's conditions based on the presence of the pistol, the officers were authorized to conduct a probation search, during which they found the other firearms and ammunition. (*See* Doc. 24 at 25 (describing when and where other firearms and ammunition were found)).

Accordingly, Wallace's Fourth Amendment rights were not violated and suppression of the firearms and ammunition is not warranted.

C.   *Inevitable Discovery Doctrine*

Even if the protective sweep and subsequent seizure of evidence was unconstitutional, the inevitable discovery doctrine would allow the admission the

firearms. The inevitable discovery exception applies if, "by following routine procedures, the police would inevitably have uncovered the evidence[.]" *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009) (internal citation and quotation marks omitted). As stated, as part of Wallace's conditions of release, he was required to make his residence available for home visits, including the first check of a residence, by the Probation Office. Gonzalez testified that during the first check of Wallace's residence, which they intended to undertake that day when they decided to visit Wallace, they would have had Wallace take them on a tour of the entire residence. Gonzalez further testified that during that tour, they would have seen the firearm because the bedroom door was open and the pistol was directly viewable from the entryway to the bedroom. The officers' observation of the pistol, whether during the protective sweep or during a first check tour, provided/would have provided officers with reasonable suspicion to search the rest of the property and seize the other firearms and ammunition.

Accordingly, the inevitable discovery doctrine independently justified the officers' seizure of the firearms and ammunition at issue.

## III.   Conclusion

IT IS SO ORDERED that Defendant Philip Anthony Wallace's Motion to Suppress (Doc. 22) is GRANTED as to Wallace's statement that firearms were in

his residence and DENIED as to the statement that he was caught and the firearms

seized in the residence.

DATED this 6th day of May, 2024.

SUSAN P. WATTERS
United States District Judge